## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

| | |
|---|---|
| HOME DEPOT U.S.A., INC. and KIMBERLY-CLARK CORP., <br><br>      Plaintiff, <br><br> v. <br><br> SEA STAR LINE, LLC, SALTCHUK RESOURCES, INC., TOTEM OCEAN TRAILER EXPRESS, INC., AND LEONARD SHAPIRO, <br><br>      Defendants. | Civil Action File <br> No.: _____ <br><br> **COMPLAINT** <br><br> **AND DEMAND FOR JURY TRIAL** |

### COMPLAINT

Plaintiffs Home Depot U.S.A., Inc. and Kimberly-Clark Corp., by and through their undersigned counsel, allege as follows:

1.     Plaintiffs were purchasers of Puerto Rican Cabotage shipping services who were injured as a result of Defendants' participation in an unlawful conspiracy to fix prices, fees and surcharges, rig bids, and allocate customers in the Puerto Rican Cabotage market beginning at least as early as May 2002 and continuing until at least April 2008. The majority of the freight targeted by the conspiracy passed through the Port of Jacksonville, Florida.

2.     "Puerto Rican Cabotage" means coastal water freight transportation services between the United States and the Commonwealth of Puerto Rico ("Puerto Rico").

3.     As alleged herein, thus far, an investigation of the conspiracy in the Puerto

Rican Cabotage market by the U.S. Department of Justice has yielded guilty pleas by

three Puerto Rican Cabotage carriers (Sea Star Line,  Horizon Lines, and Crowley Liner)

and four individual employees of those carriers (Baci, Gill, Glova, and Serra) for

violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  A fifth individual

(Chisholm) pleaded guilty to obstruction of justice regarding his attempt to conceal the

existence of the conspiracy by destroying documents and other records implicating the

conspirators.

4.     The investigation by the U.S. Department of Justice is ongoing.  On

November 17, 2011, the Department of Justice announced that Defendant Sea Star agreed

to plead guilty and that its indictment of Sea Star and its former officer Frank Peake

"arose from an ongoing federal investigation into price fixing, bid rigging, and other

anticompetitive conduct in the coastal water freight transportation industry."  On

information and belief, additional indictments are forthcoming.

### Jurisdiction and Venue

5.     Plaintiffs bring this action under Sections 4, 12 and 16 of the Clayton Act,

15 U.S.C. §§ 15, 22 and 26, for treble damages and for permanent injunctive relief, as

well as reasonable attorneys' fees and costs, with respect to the injuries sustained by

Plaintiffs arising from Defendants' violations of Section 1 of the Sherman Antitrust Act,

15 U.S.C. § 1.

6.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15(c), 22 and 26.

7.     Defendants and their co-conspirators marketed and sold substantial quantities of Puerto Rican Cabotage in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States and Puerto Rico.  Therefore, the activities of the Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

8.     This Court has personal jurisdiction over the Defendants under the Florida long-arm statute because each Defendant transacted business in this District and elsewhere, had substantial contacts in this District and elsewhere, resided in this District, and/or engaged in an unlawful conspiracy that was directed at and had the intended effect of causing injury to persons residing in or doing business in this District and elsewhere.

9.     Venue is proper in this District pursuant to 15 U.S.C § 22 and 28 U.S.C. § 1391(b) and (c), because, as set out herein, all Defendants and their co-conspirators either resided, transacted business, were found, and/or had agents in this District; because Plaintiff Home Depot U.S.A., Inc. operates retail stores in this District and Plaintiff Kimberly-Clark Corp. sells and distributes its products in this District; and/or because one or more conspiratorial acts were conducted in this District, as alleged herein.

10.     The existence of personal jurisdiction as to each defendant and the properness of venue in this District are supported by the following, among other things:

a.     Corporate Defendant Sea Star Line, LLC, and corporate co-conspirators Crowley Liner Services, Inc., Crowley Maritime, Inc., and Trailer Bridge, Inc. are all headquartered and maintain their principal place of business in Jacksonville, Florida.

b.      Individual co-conspirators Peter Baci, Alexander Chisholm, Frank Peake, Tom Farmer, David Miskowiec, and Rob Grune worked and resided in Jacksonville, Florida during the conspiracy.

c.      Corporate Defendant Saltchuk Resources, Inc. had agents in Jacksonville during the conspiracy including Leonard Shapiro, Mark Tabbutt, and Robert Magee.  Leonard Shapiro, Mark Tabbutt, and Robert Magee regularly traveled to Jacksonville on behalf of Saltchuk Resources, Inc. to meet with Sea Star Line, LLC personnel and carry out acts in furtherance of the conspiracy.

d.      Corporate Defendant Totem Ocean Trailer Express, Inc. had agents in Jacksonville during the conspiracy including Leonard Shapiro.  Leonard Shapiro regularly traveled to Jacksonville on behalf of and as an officer for Totem Ocean Trailer Express, Inc. and carried out acts in furtherance of the conspiracy while in the District.

e.      Many, and likely the majority, of the acts in furtherance of the conspiracy occurred in this District, as further detailed below.  For example, various in-person meetings between conspirators occurred in Jacksonville.  Additionally, there were routine telephone, fax, and email communications with conspirators that were based in Jacksonville.  Moreover, implications of the conspiracy were seen in this District— sailings between Jacksonville and Puerto Rico were manipulated following agreement among conspirators, including Sea Star Line, LLC, Saltchuk Resources, Inc., Totem Ocean Trailer Express, Inc. and Leonard Shapiro.

f.      The Port of Jacksonville is the principal port used by the conspirators for the shipping of price-fixed cargo between the United States and Puerto Rico.

g.      The Department of Justice's investigation into this antitrust conspiracy was centered in Jacksonville, Florida: search warrants were executed in this District; the prosecutions stemming from the investigation were conducted in this District; and resulting guilty pleas were entered in this District.

### Plaintiffs

11.      Plaintiff Home Depot U.S.A., Inc. ("Home Depot") is a Delaware corporation with its principal place of business in Atlanta, Georgia.  Home Depot operates over 2,200 retail stores, including stores throughout Florida, selling building and home improvement products.

12.      During the relevant time, Home Depot purchased Puerto Rican Cabotage services directly from the conspirators, including the Defendant Sea Star.  As a result of the conspiracy, Home Depot was injured in its business or property by reason of the antitrust violations pleaded.  Home Depot contracted directly with Defendants and/or their co-conspirators pursuant to 49 U.S.C. § 14101(b).  In accordance with this provision, Home Depot's contract expressly waived all rights and remedies under Section B of the Interstate Commerce Commission Termination Act and Home Depot's "exclusive remedy" under §14101(b)(2) for the fixing of rates, surcharges, and other fees, bid rigging, and customer allocation by Defendants and their co-conspirators in violation of the federal antitrust laws is an action in federal court.  As a result, the Surface

Transportation Board ("STB") has no regulatory authority over any aspect of Home Depot's contract, including the rates, surcharges, and other fees set forth in the contract.

13.     Additionally, Horizon Lines—one of Sea Star's admitted co-conspirators—has repeatedly stated in its securities filings with the U.S. Securities and Exchange Commission that the confidential contracts used on the Puerto Rico trade are exempt from STB regulation and, therefore, the filed rate doctrine could not possibly apply. "Our rates in the Puerto Rico and Alaska markets are predominantly contained in negotiated transportation service contracts which are exempt from STB rate regulation." (Horizon Lines May 19, 2006 S-1 Registration Statement, at 103.) "[I]n the case of our Puerto Rico and Alaska trade routes, we primarily ship containers on the basis of confidential negotiated transportation service contracts that are not subject to rate regulation by the STB." (Horizon Lines, 2007 10-K at 42.)

14.     From time to time, Home Depot used a third-party consolidation and logistics provider known as Red Oak Industries, Inc. ("Red Oak") to facilitate and coordinate its purchases of Puerto Rican Cabotage services from Defendant Sea Star and/or its co-conspirators pursuant to the agreements referenced above.  Home Depot contends that it was the direct purchaser of such services.  Regardless, in April 2009, prior to the class exclusion deadline in the class action case, *In Re: Puerto Rican Cabotage Antitrust Litigation*, Master Docket No. 08-md-1960 (D.P.R.) (the "Class Action Case"), Red Oak assigned any and all of its claims it may have had related to Home Depot shipping in the litigation to Home Depot, and Red Oak did not submit claims in the Class Action Case related to Home Depot shipping.  Home Depot timely

6

excluded itself and its assigned claims from the Class Action Case and provided notice to

the Court and the parties of this exclusion.  Because Home Depot had the right to exclude

its own and its assigned claims from the Class Action Case and pursue those claims in

any appropriate forum, there is no danger of multiplicative litigation.  Accordingly,

Home Depot brings this action regarding its own direct purchases of Puerto Rican

Cabotage and its assigned claims regarding the same.

15.     Plaintiff Kimberly-Clark Corporation ("Kimberly-Clark") is a Delaware

corporation with its principal place of business in Irving, Texas.  Kimberly-Clark

manufactures and sells health, hygiene and personal care solutions under a family of

global brands, including Kleenex, Scott, Huggies, Pull-Ups, Kotex and Depend.

Kimberly-Clark products are distributed and sold in locations throughout the United

States and all over the world, including, *inter alia*, Florida.

16.     During the relevant time, as alleged below, Kimberly-Clark purchased

Puerto Rican Cabotage services directly from the Defendants and/or their co-

conspirators.  As a result of the conspiracy, Kimberly-Clark was injured in its business or

property by reason of the antitrust violations pleaded.  Kimberly-Clark contracted directly

with Defendants and/or their co-conspirators pursuant to 49 U.S.C. § 14101(b).  In

accordance with this provision, Kimberly-Clark's contract expressly waived all rights and

remedies under Section B of the Interstate Commerce Commission Termination Act, and

Kimberly-Clark's "exclusive remedy" under § 14101(b)(2) for the fixing of rates,

surcharges, and other fees, bid rigging, and customer allocation by Defendants and their

co-conspirators in violation of the federal antitrust laws is an action in federal court.  As a

result, the STB has no regulatory authority over any aspect of Kimberly-Clark's contract, including the rates, surcharges, and other fees set forth in the contract.

17.     Prior to its exclusion from the class, Kimberly-Clark was a putative member of the Class Action Case.  Kimberly-Clark timely excluded from the Class Action Case and provided notice to the Court and the parties of this exclusion and now brings this action regarding its direct purchases of Puerto Rican cabotage.  Because Kimberly-Clark had the right to exclude itself from the class action and pursue its own claims in any appropriate forum, there is no danger of multiplicative litigation.  Accordingly, Kimberly-Clark brings this action regarding its own direct purchases of Puerto Rican cabotage.

### Defendants and Their Co-Conspirators

18.     Defendant Sea Star Line, LLC ("Sea Star") is a Delaware limited liability company with its principal place of business in Jacksonville, Florida.  Sea Star is privately owned and managed by TOTE Inc. (f/k/a American Shipping Group, Inc., which is wholly-owned by Saltchuk Resources, Inc.) and Taino Star, Inc.  Prior to 2005, Saltchuk Resources, Inc. directly owned and controlled Sea Star.  Sea Star provides integrated transportation services to and from the United States and Puerto Rico.  Sea Star accounts for approximately 21 percent of the Puerto Rican Cabotage market.  Sea Star marketed and sold Puerto Rican Cabotage in the United States and this District from at least as early as May 2002 and continuing until at least as late as April 2008.

19.     In July 2003, Frank Peake ("Peake") was appointed by Saltchuk to be the Chief Operating Officer of Sea Star.  Peake, who later became the President of Sea Star,

was made responsible for determining Sea Star's pricing for Puerto Rican Cabotage. Prior to July 2003, Peake was the Vice President and General Manager of the Alaska Division of CSX Lines, which later became Horizon, as defined herein. Peake participated in the conspiracy at Sea Star and engaged in direct communications and agreements with competitors at CSX/Horizon and Crowley.

20.    As alleged herein, Peake was indicted by the U.S. Department of Justice for participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

21.    Peter Baci ("Baci") is an individual residing in Jacksonville, Florida. During the relevant period, Baci was the Senior Vice President of Yield Management for Sea Star and was responsible for determining Sea Star's pricing for Puerto Rican Cabotage. Before joining Sea Star, Baci had been a long-time Crowley employee. Baci participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

22.    As alleged herein, Baci was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

23.    Alexander G. Chisholm ("Chisholm") is an individual residing in Jacksonville, Florida. During the relevant period, Chisholm was the Assistant Vice President of Yield Management for Sea Star. Prior to working for Sea Star, Chisholm worked for Crowley Maritime, where he first met co-conspirator Thomas Farmer.

24.     As alleged herein, Chisholm was indicted by the U.S. Department of Justice and pleaded guilty to obstruction of justice for attempting to destroy documents and other information related to the conspiracy.

25.     Defendant Saltchuk Resources, Inc. ("Saltchuk") is a Washington corporation with its principal place of business in Seattle, Washington. Saltchuk, which was incorporated in 1982, is a privately held holding company with approximately sixteen predominately maritime businesses, including Defendants Sea Star and TOTE. Upon information and belief, Saltchuk directly participated in the conspiracy through its officers, directors, and/or agents, including Leonard Shapiro, Robert Magee, and Mark Tabbutt.

26.     Upon information and belief, Saltchuk exercised extensive and pervasive control over Sea Star and disregarded the corporate form and independence of Sea Star.

      a.     Financially, Saltchuk siphoned funds from Sea Star, commingled its accounts with Sea Star, budgeted capital expenditures for Sea Star, guaranteed Sea Star's debt, received distributions and dividends from Sea Star, and made determinations as to compensation for Sea Star personnel.

      b.     Operationally, Saltchuk controlled the Board of Directors of Sea Star and selected, appointed, and terminated Sea Star's executive-level personnel. Saltchuk executives regularly met with Sea Star executives to discuss operations.

      c.     Strategically, Saltchuk directed and influenced Sea Star's pricing structure and required Sea Star employees to compile market share information related to Sea Star and Horizon sailings for Saltchuk. Saltchuk was heavily involved in Sea Star's

decision-making, such as determining whether Sea Star should contract with other Saltchuk entities. Saltchuk also directed Totem Ocean Trailer Express, Inc. to make several employees available to assist at Sea Star. Taken together, Saltchuk and Sea Star effectively functioned as one with Sea Star serving as Saltchuk's agent and alter ego.

27.     In an action brought against Saltchuk, Sea Star, and other defendants by Caribbean Shipping for the same conspiracy, Saltchuk did not contest venue or personal jurisdiction in Duval County, Florida. <u>Caribbean Shipping Services, Inc. v. Sea Star Line, LLC et al.</u>, No. 16-2008-CA-008795, Division CV-G.

28.     Defendant Totem Ocean Trailer Express, Inc. ("TOTE") is a privately owned Washington corporation with its principal place of business in Federal Way, Washington. TOTE is owned by Saltchuk and is an affiliate of Sea Star. TOTE operates shipping services between Washington and Alaska, but it participated in the conspiracy regarding Puerto Rican Cabotage through its officers and agents, including Leonard Shapiro, who served as Vice President of Pricing, and Robert Magee, who served as Chairman, President, CEO and Director of TOTE.

29.     Defendant Leonard Shapiro ("Shapiro"), upon information and belief, resides on Mercer Island, Washington. Shapiro was a founder and was a partner in Saltchuk during the conspiracy period. Shapiro is also the Vice President of Pricing for TOTE, another Saltchuk subsidiary. Although Shapiro was not a Sea Star employee, on information and belief, Shapiro instigated, participated in, and directed the conspiracy involving Puerto Rican Cabotage and Sea Star on behalf of Saltchuk and TOTE. TOTE and Saltchuk sent Shapiro from Seattle, WA to Jacksonville to oversee Sea Star's market

development and pricing before and during the conspiracy. In addition, Shapiro

exercised control over Sea Star officers and directors, including Peter Baci; and he

reached unlawful agreements with Horizon concerning the Puerto Rican Cabotage

market.

30.     Crowley Maritime Corporation ("Crowley Maritime") is a privately

owned Delaware corporation with its principal place of business at 9487 Regency Square

Boulevard, Jacksonville, Florida.

31.     Crowley Liner Services, Inc. ("Crowley Liner") is a Delaware corporation

with its principal place of business at 9487 Regency Square Boulevard, Jacksonville,

Florida. Crowley Liner is a wholly-owned subsidiary of Crowley Maritime. Crowley

Liner has operated a fleet of 35 vessels and provides scheduled marine transportation

services between the continental United States and ports in the Caribbean and Central

America, including ports in Puerto Rico. Crowley Liner has operated at least nine large,

multi-deck "rolls-on/rolls-off" ("ro/to") barges that ship goods to and from Puerto Rico.

32.     Crowley Maritime and Crowley Liner are hereafter collectively referred

to, in this Complaint, as "Crowley." Crowley has been in the business of liner services,

logistics, energy support, project management, ocean towing and transportation,

petroleum and chemical transportation, fuel sales and distribution, ship assist and escort,

salvage and emergency response, vessel construction and naval architecture, and ship

management. Crowley accounts for approximately 31 percent of the Puerto Rican

Cabotage market and uses tugs and barges to provide its services in this market. Crowley

marketed and sold cabotage in the United States and in this District from at least as early as May 2002 and continuing until at least April 2008.

33.    During the conspiracy period, Thomas Farmer ("Farmer") served as Vice President and General Manager, Sales & Marketing for Crowley's Puerto Rican Cabotage business.  Farmer, who was based in Jacksonville, Florida,  participated in the conspiracy to fix prices and surcharges, allocate customers and rig bids in the Puerto Rican cabotage market as alleged herein.

34.    Robert Grune became Senior Vice President and General Manager of Crowley's Puerto Rico and Caribbean liner services business unit in June 2005 and remained in that position throughout the remainder of the conspiracy period.  Farmer reported directly to Grune, while Grune reported to Tom Crowley, Jr.  Grune, who was based in the Jacksonville area, participated in the conspiracy to fix prices and surcharges, allocate customers and rig bids in the Puerto Rican cabotage market as alleged herein.

35.    CSX Corporation ("CSX Corporation") is a Virginia corporation headquartered in Jacksonville, Florida. CSX provides rail, intermodal, domestic-container shipping, barging, and contract logistics worldwide, including in this District.   As set out below, CSX Corporation is the former owner of co-conspirator CSX Lines, which became Horizon Lines.

36.    Horizon Lines, Inc. ("Horizon") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  It has operated as a holding company for the following wholly-owned subsidiaries: (i) Horizon Lines, LLC; (ii) Horizon Logistics Holdings, LLC; and (iii) Horizon Lines of Puerto Rico, Inc.

37.    Horizon Lines, LLC ("Horizon LLC") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina.  It is an ocean carriage containership operating subsidiary of Horizon Lines, Inc.  Horizon LLC operates a fleet of 21 United States-flag containerships and five port terminals linking the continental United States with Puerto Rico, Hawaii, Alaska, Guam, and Micronesia. Horizon Lines, LLC was formerly known as CSX Lines, LLC ("CSX Lines").  During the relevant period, particularly at the start of the conspiracy, CSX Lines was a wholly-owned subsidiary of CSX Corporation. CSX Lines, LLC remained a wholly-owned subsidiary until it was sold to a venture capital group in February 2003.

38.    Horizon Logistics Holdings, LLC ("Horizon Logistics") is a Delaware limited liability company with its principal place of business in Charlotte, North Carolina. It is an ocean carriage management operating subsidiary of Horizon Inc.

39.    Horizon Lines of Puerto Rico, Inc. ("Horizon Puerto Rico") is a Delaware corporation with its principal place of business in San Juan, Puerto Rico.  Horizon Puerto Rico is in the business of ocean shipping and operates a marine terminal in San Juan, Puerto Rico.

40.    Horizon Lines, Inc., Horizon LLC, Horizon Logistics and Horizon Puerto Rico are hereafter collectively referred to, in this Complaint, as "Horizon."  Horizon is the nation's leading domestic ocean shipping and integrated logistics company, accounting for approximately 38 percent of total United States maritime container shipments from the continental United States to Puerto Rico, Hawaii, Alaska, Guam and Micronesia, and approximately 35 percent of the Puerto Rican Cabotage market.  Horizon

marketed and sold Puerto Rican Cabotage in the United States and in this District from at least as early as May 2002 and continuing until at last April 2008.

41.     Charles G. "Chuck" Raymond ("Raymond") is an individual residing in Charlotte, North Carolina. Raymond was the Chairman, President, and Chief Executive Officer of CSX Lines and later Horizon Lines, Inc. during the time of the conspiracy. During the relevant period, Raymond was responsible for determining CSX Lines and Horizon's pricing for Puerto Rican Cabotage. On information and belief, Raymond participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

42.     Gabriel Serra ("Serra") is an individual residing in San Juan, Puerto Rico. During the relevant period, Serra was the Senior Vice President and General Manager for the Puerto Rico Division of Horizon LLC and was responsible for determining Horizon's pricing for Puerto Rican Cabotage. Serra participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

43.     As alleged herein, Serra was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

44.     R. Kevin Gill ("Gill") is an individual residing in Charlotte, North Carolina. From at least as early as May 2002 until December 2004, Gill was the

Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican Cabotage. From December 2005 until at least April 2008, Gill was Horizon's Vice President of Marketing and was responsible for marketing Horizon's Puerto Rican Cabotage services. Gill participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

45. As alleged herein, Gill was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

46. Gregory Glova ("Glova") is an individual residing in Charlotte, North Carolina. From December 2005 until at least April 2008, Glova was the Marketing and Pricing Director for Horizon's Puerto Rico division and was responsible for determining Horizon's pricing for Puerto Rican Cabotage. Glova participated in the conspiracy involving Puerto Rican Cabotage and reached unlawful agreements with co-conspirators in furtherance of the conspiracy to fix, stabilize or increase prices and surcharges, allocate customers, and manipulate capacity.

47. As alleged herein, Glova was indicted by the U.S. Department of Justice and pleaded guilty to participating in a criminal conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rican Cabotage services.

48. During the conspiracy period, Tom Cowan was retained by Raymond as a "consultant" for Horizon, but Cowan served simultaneously as a consultant for Sea Star,

Saltchuk, and TOTE. Cowan participated in meetings in this District in furtherance of

the conspiracy. Prior to serving as a consultant, Cowan was a senior vice of marketing

for CSX Lines and had responsibility for the Alaskan cabotage. On information and

belief, Cowan facilitated communications between Horizon and Saltchuk and TOTE

about competitive issues in furtherance of the conspiracy.

49.     Trailer Bridge, Inc. ("Trailer Bridge") is a Delaware corporation with its

principal place of business in Jacksonville, Florida. Trailer Bridge offers integrated

freight shipping services between the continental United States and Puerto Rico. Trailer

Bridge marketed and sold Puerto Rican Cabotage in the United States and in this District

during the relevant period. Although not named as a defendant in this case, Trailer

Bridge participated in the conspiracy as alleged herein.

### Government Investigation and Prosecution

50.     On or about April 17, 2008, FBI agents executed search warrants in

Jacksonville, Florida on the premises of Horizon, Sea Star, and Crowley regarding Puerto

Rican Cabotage. That the U.S. Department of Justice used search warrants, which may

only be issued based on a judicial determination of probable cause – and not simply

grand jury subpoenas – underscores the seriousness of the illegal activity engaged in by

the conspirators, including Defendants.

51.     Following the U.S. Department of Justice searches in Jacksonville,

Horizon issued a press release revealing that it was served with search warrants and a

grand jury subpoena in connection with an investigation by the Department's Antitrust

Division into the pricing practices of ocean carriers operating in the Puerto Rico trade.

(See Press Release, Horizon Lines, Inc., "Horizon Lines Issues Statement on Antitrust Investigation" (Apr. 17, 2008)). Horizon Lines, Inc. also discussed the subpoena in a 10-Q filing dated April 25, 2008. Horizon Lines, Inc. issued another press release on May 28, 2008 announcing that it had placed six employees involved in the Puerto Rico trade on administrative leave as a result of its review of issues raised by the DOJ's investigation. (See Press Release, Horizon Lines, Inc., "Horizon Lines Announces Personnel Administrative Action" (May 28, 2008)).

52.     Horizon Lines, Inc.'s 2008 10-K contained the following information regarding the Department of Justice's investigation: "On April 17, 2008, the Company received a grand jury subpoena and search warrant from the U.S. District Court for the Middle District of Florida seeking information regarding an investigation by the Antitrust Division of the Department of Justice ("DOJ") into possible antitrust violations in the domestic ocean shipping business." Horizon Lines, Inc. further acknowledged that "in connection with the DOJ investigation, it is possible that the Company could suffer criminal prosecution and be required to pay a substantial fine." Horizon Lines, Inc. then explained that "[o]n October 20, 2008, three former managers of the Company plead [sic] guilty to a conspiracy to eliminate competition and raise prices for moving freight between the continental U.S. and Puerto Rico."

53.     Sea Star was also subject to a raid by the FBI on or about April 17, 2008. Following the raids, Chisholm deleted certain files that exposed the conspirators' culpability in the unlawful scheme. These files were later recovered and turned over to the DOJ.

54.     According to news reports, Crowley's Jacksonville office was likewise raided by the FBI on or about April 17, 2008, in conjunction with the FBI's investigation of anti-competitive conduct in the Puerto Rican Cabotage market.

55.     On May 15, 2008, Trailer Bridge filed a Form 10-Q in which it admitted that it, too, had been served with a subpoena by the DOJ seeking documents and information relating to a grand jury investigation of unlawful pricing practices among Puerto Rico ocean carriers.

56.     On October 1, 2008, Baci, Gill, Glova, and Serra were charged by criminal information with one count of conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of 15 U.S.C. § 1, and each subsequently pleaded guilty to the charged offense.

57.     On October 20, 2008, Sea Star's Baci filed an agreement in the U.S. District Court for the Middle District of Florida in which he agreed to plead guilty to the criminal information alleging that he:

> "(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) sold Puerto Rico freight services at collusive and
noncompetitive prices pursuant to the agreements reached;

(f) accepted payment for Puerto Rico freight services at collusive
and noncompetitive prices;

(g) authorized or consented to the participation of subordinate
employees in the conspiracy; and

(h) concealed the conspiracy and conspiratorial contacts through
various means, including private e-mail accounts."

58.     Pursuant to his plea agreement, Baci admitted that "[d]uring the relevant

period, [Baci] committed acts in furtherance of the conspiracy, including engaging in

discussions and attending meetings with representatives of one or more competing

providers of Puerto Rico freight services. During such discussions and meetings,

agreements were reached between and among competitors for Puerto Rico freight

services to allocate customers, rig bids submitted to government and commercial buyers,

and to fix the prices of rates, surcharges and other fees charged to customers." (Baci Plea

Agreement at 4.)

59.     Baci, who as set forth above, coordinated the implementation of the

conspiracy, specifically admitted in his Pre-Sentencing Memorandum that the

"companies involved with antitrust violations include[d] Sea Star, Horizon, Crowley and

Trailer Bridge." (Baci's Sentencing Mem. at 8). Further, his Pre-Sentencing

Memorandum stated that Leonard Shapiro "was someone of massive authority" who

threatened and directed the termination of employment of others at Sea Star; that Baci

was ordered to implement the illegal agreement reached between Shapiro and Serra; and

that Baci did, in fact, implement this agreement in coordination with Horizon's Gill. (*Id.* at 8-9.)

60.    During the sentencing hearing on January 30, 2009, the U.S. Department of Justice stated on the record that, as part of his cooperation with the Department's investigation, Baci provided the Department with, *inter alia*, "specific instances of conduct" against Crowley and Trailer Bridge. (Jan. 30, 2009 Sentencing Tr. 56.)

61.    On January 30, 2009, Baci was sentenced to forty-eight (48) months in prison, which was "the longest jail term ever imposed for a single antitrust violation," according to the U.S. Department of Justice, for violating 15 U.S.C. § 1.

62.    On October 20, 2008, Horizon's Gill filed an agreement in the U.S. District Court for the Middle District of Florida in which he agreed to plead guilty to the criminal information alleging that he:

> "(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;
>
> (b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;
>
> (c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;
>
> (d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;
>
> (e) sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorized or consented to the participation of subordinate employees in the conspiracy; and

(h) concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

63.     Pursuant to his plea agreement, Gill admitted that "[d]uring the relevant period, [Gill] committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.  During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers."  (Gill Plea Agreement at 4.)

64.     On May 12, 2009, Gill was sentenced to twenty-nine (29) months in prison for violating 15 U.S.C. § 1.

65.     On October 20, 2008, Horizon's Glova filed an agreement in the U.S. District Court for the Middle District of Florida in which he agreed to plead guilty to the criminal information alleging that he:

"(a) participated in meetings, conversations, and communications in the United States and elsewhere to discuss customers, rates, and bids for the sale of Puerto Rico freight services;

(b) agreed during those meetings, conversations, and communications to allocate customers of Puerto Rico freight services between and among the conspirators;

(c) agreed during those meetings, conversations, and communications to fix, stabilize, and maintain rates, surcharges, and other fees charged to customers of Puerto Rico freight services;

(d) agreed during those meetings, conversations, and communications to rig bids submitted to commercial and government customers of Puerto Rico freight services;

(e) sold Puerto Rico freight services at collusive and noncompetitive prices pursuant to the agreements reached;

(f) accepted payment for Puerto Rico freight services at collusive and noncompetitive prices;

(g) authorized or consented to the participation of subordinate employees in the conspiracy; and

(h) concealed the conspiracy and conspiratorial contacts through various means, including private e-mail accounts."

66.     Pursuant to his plea agreement, Glova admitted that "[d]uring the relevant period, [Glova] committed acts in furtherance of the conspiracy, including engaging in discussions and attending meetings with representatives of one or more competing providers of Puerto Rico freight services.   During such discussions and meetings, agreements were reached between and among competitors for Puerto Rico freight services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers." (Glova Plea Agreement at 4.)

67.     On May 12, 2009, Glova was sentenced to twenty (20) months in prison for violating 15 U.S.C. § 1.

68.     On October 20, 2008, Horizon's Serra filed an agreement in the U.S.

District Court for the Middle District of Florida in which he agreed to plead guilty to the

criminal information alleging that he:

> "(a) participated in meetings, conversations, and communications
> in the United States and elsewhere to discuss customers, rates, and
> bids for the sale of Puerto Rico freight services;
>
> (b) agreed during those meetings, conversations, and
> communications to allocate customers of Puerto Rico freight
> services between and among the conspirators;
>
> (c) agreed during those meetings, conversations, and
> communications to fix, stabilize, and maintain rates, surcharges,
> and other fees charged to customers of Puerto Rico freight
> services;
>
> (d) agreed during those meetings, conversations, and
> communications to rig bids submitted to commercial and
> government customers of Puerto Rico freight services;
>
> (e) sold Puerto Rico freight services at collusive and
> noncompetitive prices pursuant to the agreements reached;
>
> (f) accepted payment for Puerto Rico freight services at collusive
> and noncompetitive prices;
>
> (g) authorized or consented to the participation of subordinate
> employees in the conspiracy; and
>
> (h) concealed the conspiracy and conspiratorial contacts through
> various means, including private e-mail accounts."

69.     Pursuant to his plea agreement, Serra admitted that "[d]uring the relevant

period, [Serra] committed acts in furtherance of the conspiracy, including engaging in

discussions and attending meetings with representatives of one or more competing

providers of Puerto Rico freight services. During such discussions and meetings,

agreements were reached between and among competitors for Puerto Rico freight

services to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers." (Serra Plea Agreement at 4.)

70.    In the U.S. Department of Justice's Pre-Sentencing Memorandum filed May 4, 2009, the Department described Serra as having played "an integral role in dealing with other senior executives involved in the conspiracy." (*Id.* at 7.)

71.    On May 12, 2009, Serra was sentenced to thirty-four (34) months in prison for violating 15 U.S.C. § 1.

72.    On October 1, 2008, Sea Star's Chisholm was charged by criminal information with corruptly altering, destroying, and concealing records and documents and attempting to do so with the intent to impair the availability of the records and documents for use in a federal grand jury investigation in violation of 18 U.S.C. § 1512(c)(1).

73.    Chisholm pleaded guilty to altering, destroying, and concealing documents to impair the government's investigation.

74.    According to Chisholm's Pre-Sentencing Memorandum dated May 5, 2009: "Mr. Chisholm's role in the underlying conspiracy to violate the antitrust laws was that of a numbers cruncher. The government has described Mr. Chisholm as one of the key implementers, and that description is apt if one means by it that, as one of the three Directors of Pricing, he put into action plans made by others. Mr. Chisholm received pricing information about Sea Star's competitors from Baci, who was in direct communication with his counterparts at Horizon and Crowley. Using the competitors'

pricing information and following directions from Baci, Mr. Chisholm would re-do the bid for his customers." (Pre-Sentencing Mem. at 5.)

75.     During the sentencing hearing on May 12, 2009, the U.S. Department of Justice stated on the record that "[t]his was a conspiracy that was conducted in significant part through emails and spreadsheets. And the spreadsheets contained detailed market share information, customer information, and contact information that were circulated between the co-conspirators." (May 12, 2009 Sentencing Tr. 104.)

76.     On May 12, 2009, Chisholm was sentenced to seven (7) months in prison for violating 15 U.S.C. § 1.

77.     On March 15, 2011, Horizon Lines pleaded guilty to participating in a conspiracy to fix prices for Puerto Rican Cabotage and agreed to pay a $45 million criminal fine.

78.     On April 28, 2011, Horizon Lines' fine was reduced to $15 million in consideration of the company's financial condition and in anticipation of its need to pay restitution to the victims of the conspiracy.

79.     As set forth in the plea agreement, Horizon Lines, "through certain of its officers and employees, including high-level personnel . . . participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing rates and surcharges charged to customers for Puerto Rico freight services." (Horizon Plea Agreement at 4.)

80.     During the relevant time, Horizon Lines "[i]n furtherance of the conspiracy . . . through certain of its officers and employees, engaged in discussions and

attended meetings with representatives of other providers of Puerto Rico freight services" through which "agreements were reached to fix the rates and surcharges to be charged to customers." (Horizon Plea Agreement at 4.)

81.     On November 17, 2011, Defendant Sea Star pleaded guilty to participating in a conspiracy to fix prices for Puerto Rican Cabotage and agreed to pay a $14.2 million criminal fine.

82.     As set forth in the plea agreement, Sea Star, "through certain of its officers and employees, including high-level personnel . . . participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing rates and surcharges charged to customers for Puerto Rico freight services." (Sea Star Plea Agreement at 4.)

83.     During the relevant time, Sea Star, "[i]n furtherance of the conspiracy . . . through certain of its officers and employees, engaged in discussions and attended meetings with representatives of other providers of Puerto Rico freight services" through which "agreements were reached to fix the rates and surcharges to be charged to customers." (Sea Star Plea Agreement at 4.)

84.     Also on November 17, 2011, Sea Star's Peake was indicted with one count of conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of 15 U.S.C. § 1. The indictment alleges that Peake "did enter into and engage in a combination and conspiracy to suppress and eliminate competition by agreeing to fix rates and surcharges for Puerto Rico freight services. The charged combination and conspiracy consisted of a continuing agreement, understanding,

and concert of action among the defendant and his co-conspirators, the substantial terms

of which were to fix rates and surcharges for Puerto Rico freight services.  The

combination and conspiracy engaged in by the defendant and his co-conspirators was in

unreasonable restraint of interstate trade and commerce.  All in violation of Title 15,

United States Code § 1." (Peake Indictment at 2.)

85.     Specifically, the Indictment alleges that Peake conspired with others to

perform the following unlawful acts:

> "(a) participating in meetings, conversations, and communications in the
> continental United States and Puerto Rico to discuss customers, rates,
> surcharges and bids for the sale of Puerto Rico freight services;
>
> (b) agreeing during those meetings, conversations and communications to
> allocate customers of Puerto Rico freight services between and among the
> conspirators;
>
> (c) agreeing during those meetings, conversations, and communications to
> fix, stabilize, and maintain rates and surcharges charged to customers of
> Puerto Rico freight services;
>
> (d) agreeing during those meetings, conversations, and communications to
> rig bids submitted to government and commercial customers of Puerto
> Rico freight services;
>
> (e) engaging in meetings, conversations and communications for the
> purpose of monitoring and enforcing adherence to the agreed-upon rates
> and surcharges; (f) selling Puerto Rico freight services at collusive and
> noncompetitive rates and surcharges pursuant to the agreements reached;
>
> (g) accepting payment for Puerto Rico freight services at collusive and
> noncompetitive rates and surcharges; and
>
> (h) authorizing and consenting to the participation of subordinate
> employees in the conspiracy."

86.     Peake entered a plea of not guilty on December 15, 2011.  The case is

currently pending in the United States District Court for the District of Puerto Rico.

87.    The government's investigation is ongoing and, upon information and belief, additional indictments are expected.

88.    On July 31, 2012, Crowley Liner pleaded guilty to participating in a conspiracy to fix prices for Puerto Rican Cabotage and agreed to pay a $17 million criminal fine.

89.    As set forth in the plea agreement, Crowley Liner, "through at least one of its officers, within high-level personnel of [Crowley Liner] . . . participated in a conspiracy with other providers of Puerto Rico freight services, a primary purpose of which was to suppress and eliminate competition by fixing the base rates charged to non-government customers in particular contracts for certain Puerto Rico freight services." (Crowley Liner Plea Agreement at 4.)

90.    Specifically, during the relevant time, Crowley Liner participated in acts in furtherance of the conspiracy including  meetings and discussions in the United States and Puerto Rico.  (Crowley Liner Plea Agreement at 4.)

## ALLEGATIONS OF FACT

I.    **The Puerto Rican Cabotage Market**

91.    Ocean transport is a highly effective method for moving large quantities of non-perishable goods and raw materials. The major commodities shipped through domestic ocean shipping include manufactured goods, farm products, coal, crude petroleum, refined petroleum products and chemicals.

92.    Because ocean cabotage is the most cost-effective means of delivering products to Puerto Rico, the territory is dependent upon ocean transport to obtain both

leisure and necessary products for its population of approximately four (4) million residents.   For most products, air transport is cost-prohibitive and even physically impractical for delivery to Puerto Rico.

93.    The Puerto Rican trade lane is considered a "domestic offshore trade" or "noncontiguous domestic trade."  Pursuant to 49 U.S.C. § 13102(17), "noncontiguous domestic trade" is defined as domestic water carrier transportation "involving traffic originating in or destined to Alaska, Hawaii, or a territory or possession of the United States."

94.    The operation of a "domestic offshore trade" is governed by the Merchant Marine Act of 1920, 46 U.S.C. § 101, *et seq.*, commonly referred to as the Jones Act. The Jones Act requires that vessels carrying merchandise in such a trade be U.S.-flagged, U.S.-owned, predominately U.S.-crewed, and be owned and operated by U.S.-organized companies that are predominately controlled by U.S. citizens.

95.    The Jones Act provides no statutory or other antitrust immunity to Defendants for the collusion, customer allocation, bid rigging, or price-fixing of Puerto Rican Cabotage as alleged herein.

96.    The Jones Act produced the effect of creating a highly concentrated market for ocean transport of goods between the United States mainland and Puerto Rico. Specifically, at all relevant times, the Puerto Rican Cabotage market has been a highly concentrated oligopoly controlled by Horizon, Sea Star, Crowley, and Trailer Bridge. This effect made the market susceptible to coordinated, anticompetitive behavior by its participants, as alleged herein.  This susceptibility occurs because it is relatively easy for

a smaller group of sellers to reach agreement on customer allocation, bid-rigging and prices, and to monitor adherence to the unlawful agreements reached by the conspirators.

97. Also, as a consequence of concentrated market, individual industry participants, including several named in this complaint, worked for multiple carriers at different times. For example, Peake worked at Horizon prior to becoming president of Sea Star; Baci worked for Crowley prior to becoming a senior vice president at Sea Star; Chisholm worked for Crowley prior to becoming a pricing director at Sea Star; and Miskowiec worked for Crowley prior to becoming a vice president at Trailer Bridge.

98. In addition, the market conditions and nature of the service facilitated the anti-competitive conduct that is alleged here. Puerto Rican Cabotage is a highly fungible service. The nature of the service involves merely the transportation of goods from an originating port to a destination port according to a defined schedule. Horizon and Sea Star provide this service by operating self-powered, "blue water" vessels; Crowley and Trailer Bridge provide this service as tug-barge carriers. Although some customers may need or prefer the speed provided by vessel carriers, all four carriers generally can and do compete for the same Puerto Rican Cabotage business.

99. Because there is not significant differentiation regarding the service provided, price is a primary factor in the selection of a carrier by a customer. Consequently, rate competition among the carriers in a competitive market is fierce, and customers will often switch carriers in order to obtain a better rate. Such competition did not exist in the Puerto Rico market during the relevant time due to the unlawful behavior of Defendants and their co-conspirators.

100.    There are no viable economic substitutes for Puerto Rican Cabotage services provided by the Defendants and their co-conspirators. The transportation of goods to an island such as Puerto Rico must be accomplished by air or water, and the expense and limited capacity of air freight makes air transport an impractical option for most customers.

101.    There are substantial barriers to entry for new market participants in the Puerto Rican Cabotage industry. The cost of obtaining a ship or fleet of ships and operating in compliance with the Jones Act requirements is substantial, and no new participant has joined the Puerto Rican Cabotage market since the beginning of the conspiracy period. On the contrary, as described below, Defendants and their co-conspirators were able to reduce the number of market participants and thus reduce capacity through unlawful conduct. In addition, the Jones Act effectively excludes many existing ocean freight carriers that could otherwise compete with the Defendants and their co-conspirators because they do not operate U.S.-flagged, U.S.-built, predominately U.S.-crewed ships.

102.    The demand for Puerto Rican Cabotage services is highly inelastic because these services provide the bulk of the everyday needs of the Puerto Rican population, including necessities related to food, clothing, and shelter. Consequently, an increase in the price of Puerto Rican Cabotage services does not cause a significant decrease in the demand for those services.

103.    The combination of market conditions found in the Puerto Rican Cabotage market – including a small number of competitors, high barriers to entry, fungibility, a

lack of economic substitutes, inelastic demand, and statutory protection from international competition -- provided an ideal environment to effectuate an anticompetitive conspiracy, as occurred here.

## II.   The Conspiracy Created by Defendants and Co-Conspirators

104.   Beginning at least as early as May 2002 and continuing until at least April 2008, Defendants and others engaged in a continuing agreement, understanding and conspiracy in unlawful restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican Cabotage.

105.   The genesis of this conspiracy can be traced back at least as early as the bankruptcy of Navieras NPR ("Navieras"), one of the key participants in the Puerto Rican Cabotage market prior to 2001. The Puerto Rican government established Navieras de Puerto Rico in the early 1970s to address the lack of competition in the Puerto Rican Cabotage market. However, over the next twenty years, Navieras accrued and continued to operate with significant losses, eventually totaling in excess of $350 million. Nevertheless, Navieras regularly offered lower rates that forced Sea Star, CSX, Crowley, and Trailer Bridge to offer similarly low rates, as well.

106.   In March 1995, the government of Puerto Rico approved the sale of Navieras de Puerto Rico to BT Investment Partners, Inc., a wholly owned subsidiary of Bankers Trust New York, in exchange for $29.5 million in cash and approximately $100 million of the debt accrued by Navieras de Puerto Rico.

107.    The Navieras entity was later resold in November 1997 to Holt Hauling and Warehousing Systems, which was part of the Holt Group. On March 21, 2001, the Holt Group filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware in connection with a default of approximately $140 million of junk bonds.

108.    Pursuant to the agreed-upon plan for bankruptcy, the Navieras ships and other assets were to be sold to Sea Star for $32 million subject to an auction to be conducted by the Bankruptcy Court. Thus, at the beginning of April 2002, Sea Star announced that it planned to purchase the Navieras assets and expand the number of sailings to Puerto Rico.

109.    Although CSX Lines CEO Chuck Raymond publicly stated that his company intended to attend the Bankruptcy Court auction and possibly bid on the Navieras assets, it never submitted a bid prior to the April 22, 2002 deadline.

110.    Indeed, on or around April 20, 2002, shortly before the sale of the Navieras assets to Sea Star became final, CSX Lines' Gill received a call from his boss, Serra, the Vice President and General Manager of CSX Lines Puerto Rico Operations, instructing Gill to join Serra for a meeting with representatives of Sea Star in Charlotte, North Carolina.

111.    On April 24, 2002, Chuck Raymond, Jim McKenna, Serra, and Gill of CSX Lines met with Robert Magee, Peter Baci, and Leonard Shapiro of Sea Star/Saltchuk/TOTE, at the Park Hotel located across the street from the CSX Lines headquarters in Charlotte.

112.    The general purpose of the meeting was to discuss how to effectively operate the Puerto Rico market going forward, including how to address the Navieras business, ships and sailings that Sea Star would obtain.  The conspirators particularly focused on controlling oversupply of shipping capacity in the Puerto Rican cabotage market.  The leadership of Sea Star and CSX Lines discussed how many ships were needed in Jacksonville and other ports to support the Puerto Rico trade and how they could work together to prevent excess capacity.

113.    The result of the meeting was an agreement, memorialized in a handwritten contract, whereby none of the four vessels that Sea Star was to acquire from Navieras would be used to service Puerto Rico.  Under the agreement, Sea Star would simply scrap three of the ships.  Consequently, it would not – and could not – provide the additional sailings that it previously announced and that were formerly offered by Navieras.  The agreements reached at the Park Hotel meeting had to be and were approved at the highest levels of Saltchuk/TOTE and Horizon, including by Shapiro, Robert Magee, and Mark Tabbutt for Saltchuk.

114.    In addition, as Raymond put it, CSX Lines needed to have "some skin in the game" and thus agreed to buy one of the former Navieras ships from Sea Star for over $5 million, and immediately remove the ship from the Puerto Rico lane.

115.    CSX Lines also agreed to allow Sea Star to ship goods on CSX Lines-owned ships so as to alleviate the need to bring in additional ships.  The parties also agreed on who would ship on which days and from which ports.

116.     The only known copy of the handwritten agreement arising from the Park Hotel meeting and initialed by participants was in the possession of Gill, who retained it despite being instructed by Raymond to destroy it.

117.     Shapiro and at least eight TOTE employees were working with Sea Star in 2002 and into 2003 to assist with the assimilation of the Navieras assets and customers.

118.     As a result of Navieras' exit, the market for shipping services between the mainland United States and Puerto Rico became highly concentrated and conducive to an unlawful price-fixing conspiracy.

119.     Immediately following the Park Hotel meeting, CSX Lines announced a 10% price increase in Puerto Rico.

120.     After the Park Hotel meeting, Gill began communicating with Peter Baci of Sea Star to coordinate the effects of the expiring former Navieras contracts on the market to ensure that prices went up and market shares were sustained.

121.     In late April 2002, Sea Star's Baci and CSX Lines' Gill met at a CSX Lines-owned apartment in Charlotte for most of the day, and Baci and Gill reviewed Sea Star's customer-specific market plans.  During the meeting, Gill and Baci discussed various market segments and reached agreements about appropriate price increases, specifically targeting an initial increase of ten (10) percent.  Recognizing this price increase could not be obtained immediately, they developed and later implemented a plan to attack "low hanging fruit," such as eliminating bunker fuel exceptions.  They also developed a tier system for FAK ("freight all kind") customers.  Lastly, they agreed to

continue working together on key accounts as they came up for renewal and coordinate contract end dates to control prices, sharing all the information necessary to do so.

122.     After this initial meeting, Gill and Baci continued to communicate on these issues through frequent emails and phone conversations. When issues arose that they could not resolve the conversations were elevated to the Serra- and Peake-level, and sometimes up to Raymond and Magee.

123.     Baci often recorded these unlawful pricing agreements in a notebook, which he regularly consulted when advising his pricing managers as to the specific prices to charge various customers. The notebooks verify that Plaintiffs' businesses were a subject of conversation between Baci and Sea Star's co-conspirators. When asked by a manager whether the pricing contained in this notebook violated the antitrust law, Baci explained "not to worry because Sea Star had their backs." Sea Star employees feared that if they deviated from the pricing contained in Baci's notebook, they would be summarily terminated from the company. These threats emanated from the highest ranking officers of Sea Star and Saltchuk, including Shapiro.

124.     On February 27, 2003, CSX Corporation conveyed its majority interest in CSX Lines to a new joint venture formed with the Carlyle Group for approximately $300 million including $240 million in cash and $60 million in senior preferred securities in CSX Lines. In conjunction with this transaction, CSX Lines changed its name to Horizon Lines.

125.     As alleged herein, Tom Cowan was retained as consultant by Horizon, as well as Sea Star/TOTE/Saltchuk, and served to facilitate communication between the

conspirators.  For example, on February 28, 2003, Cowan spoke with Gill about a

meeting he had with Saltchuk's Robert Magee and another person (possibly Shapiro) and

explained that it was Saltchuk's position that Horizon was pushing too hard on the bunker

fuel surcharge.  The concern was that if fuel prices fell, the customers would expect a

reduction in the bunker fuel surcharge.  Thus, Saltchuk wanted Horizon to emphasize

increasing base rates, which would remain in place regardless of whether the fuel price

later dropped.  Magee also told Cowan that there had been a meeting in Puerto Rico two

weeks earlier over a round of golf involving Magee, John Keenan (then Horizon VP

Sales and Marketing), Serra (Horizon) and another person during which they discussed

similar "rate issues and trade practices."

126.    Beginning in at least April 2003 and continuing until at least April 2008,

Baci met with his counterparts at Horizon to discuss pricing at so-called "TSA

Meetings."  These meetings were ostensibly held to discuss borrowing container space in

competitor vessels.  However, the meetings were also used to discuss illegal price fixing.

The meetings took place on a quarterly, and sometimes monthly, basis.  For example, one

such meeting took place on October 26, 2005 at Ponte Vedra, Florida between Saltchuk's

Mark Tabbutt and Bob Magee and Horizon's Chuck Raymond and John Keenan

(Horizon's COO).

127.    On May 8, 2003 and again on June 19, 2003, William Penella (Vice

Chairman and Executive Vice President of Crowley Maritime) met with Bob Magee

(Chairman and CEO of TOTE and an agent for Saltchuk) at Jacksonville, Florida

restaurants. Carl Fox (Vice President of Sea Star and former Crowley employee) was also present at these meetings.

128. On or about June 26, 2003, Serra and Shapiro met for approximately four hours at the Omni Hotel's restaurant near the Dallas-Fort Worth airport to address Horizon's complaints to Sea Star about market behavior in Puerto Rico. Shapiro proposed that the Puerto Rico market adopt what he called the "Alaska Model." In Alaska, Horizon and TOTE were the only competitors, and they shared the cabotage business equally. This resulted in stable market shares, loyal customers, and very little price competition.

129. Serra and Shapiro agreed that Horizon and Sea Star would adopt the Alaska model in Puerto Rico. Specifically, they agreed that Horizon and Sea Star would each be entitled to a 50% share of the southbound "blue water" vessel business on sailings from Jacksonville, Florida to Puerto Rico. Although the specifics of how the agreement would be addressed at a subsequent meeting as alleged herein, the concept discussed was to share pricing information, not compete on price, and adjust market share from time to time by ceding business to one another when necessary to maintain the 50-50 market division.

130. Upon returning from this meeting, Shapiro, on behalf of TOTE and Saltchuk, met with Baci at Sea Star's offices in Jacksonville, Florida. In Jacksonville, Shapiro told Baci of the meeting with Serra and their agreement that Horizon and Sea Star would share the Puerto Rican Cabotage "blue water" business on a 50-50 basis so that Baci could begin to carry out the agreement, which he did. All of Shapiro's actions

to initiate and implement this conspiracy on the Puerto Rico trade were done as an officer, director and/or actual and apparent agent of Saltchuk and TOTE.

131.    Previously, in 2001, Shapiro had met with Sea Star's Vice President Bill Stallings at least three times. Shapiro complained to Stallings of the rate erosion in the Puerto Rico trade. Shapiro instructed Stallings to conspire with his counterparts at Horizon so as to improve rates. These meetings occurred at Sea Star's Jacksonville offices. Shapiro also directed Sea Star's Baci to organize lunches for Shapiro so that he could meet with Baci's counterparts at other carriers.

132.    Following the Serra and Shapiro meeting, the information sharing between Sea Star and CSX Lines/Horizon intensified further. Price information sharing was generally conducted between Baci and Gill. Baci created so-called "Who shot John" lists for specific problems that he encountered with Horizon. He provided the lists to Peake, who met with Serra in Puerto Rico periodically to address the issues. Thus, more difficult issues were elevated to Peake and Serra, but occasionally these issues reached the CEO-level of Raymond and Magee.

133.    On December 11, 2003, Horizon's CEO Raymond wrote a handwritten letter to Horizon managers, including Serra and Gill, notifying them that Leonard Shapiro of TOTE was joining the board of Saltchuk. Raymond explained that he had a conversation with "Saltchuk folks" and "was reassured this has no impact whatsoever on the Corporate pricing philosophy." Raymond added instructions to the top of the note: "Please read and destroy." This communication was intended to assure the individual

conspirators at Horizon that the conspiracy would not be interrupted by Shapiro's transition, and, as alleged herein, it was not.

134.    On February 10, 2004, Sea Star issued a press release acknowledging that Saltchuk/TOTE's Shapiro was heavily involved in Sea Star's operations. The press release stated that Sea Star had presented "Leonard Shapiro – Totem Ocean Trailer Express" with its Navigator Award. This award is given to individuals that have a positive impact on the development and growth of Sea Star.

135.    Sea Star's Baci kept Shapiro's cell phone and business numbers in his personal spiral note books, as well as email addresses of Shapiro and Magee at totemocean.com.

136.    During a quarterly management review meeting in April 2004, Saltchuk's Magee discussed Saltchuk's corporate philosophy with Sea Star management and stated that Sea Star needed to increase rates by at least 20%.

137.    In 2005, Sea Star raised the notion of bringing another ship into the Puerto Rican Cabotage market. Specifically, on August 19, Saltchuk's Robert Magee emailed Raymond about Sea Star's plan to add a third ship to its Puerto Rico service and sought to assure Horizon that Sea Star would be "responsible" regarding its rates despite adding another vessel.

138.    Horizon, fearing that the additional ship would cause oversupply and lead to lower prices, objected. Thereafter, Horizon's Raymond and Saltchuk's Robert Magee met and communicated on numerous occasions to attempt to coordinate these market supply issues.

139.     In late October 2005, Serra, Grune, Robert Magee, and John McCown—

from Horizon, Crowley, TOTE/Saltchuk, and Trailer Bridge, respectively—attended and

were photographed together at the 2005 Puerto Rico Summit II in Jacksonville, Florida.

At an earlier Puerto Rico Summit, held in August 2003, Saltchuk/TOTE's Bob Magee

made a presentation in which he urged carriers to increase rates by 50%.

140.     On October 26, 2005, Robert Magee and Mark Tabbutt met with

Horizon's Raymond and John Keenan in Ponte Vedra, Florida to discuss the capacity

issues related to Puerto Rican Cabotage, including Sea Star's proposed third ship, *El

Faro*. TOTE operated the vessel *El Faro*, formerly known as *Northern Lights* until late

2005. Saltchuk directed and paid for the conversion of *El Faro* from a ro-ro vessel for at

least $10 million.

141.     During the same trip, Tabbutt and Magee attended the JAXPORT Puerto

Rico Summit II at the Renaissance World Golf Village on Sea Star's behalf.  While at the

event, Magee met and had a group photograph taken with Horizon's Serra, Crowley's

Grune, and Trailer Bridge's McCown.

142.     Also in 2005, Sea Star's Peter Baci met with Horizon's Kevin Gill and/or

Greg Glova in Orlando, Florida at the Hyatt Orlando Airport hotel.  At this meeting,

various aspects of the conspiracy were discussed, including pricing and profit plans or

"Yield Plans."

143.     Horizon's Gill was aware that he was participating in an unlawful

conspiracy and retained key documents and emails, despite being instructed to destroy

them, in order to show that his actions were conducted with the knowledge and often
under the instruction of his superiors at Horizon.

144.    By late 2005, Gill was so uncomfortable with his participation in the
obviously illegal activities that he asked to be moved to a new position.  Horizon obliged
by promoting Gill.  Serra and Gill selected Gregory Glova to replace Gill.

145.    In November 2005, Cowan met with Magee and Tabbutt to discuss
Horizon's concern that Saltchuk would add a third ship to the Puerto Rico Trade.  Cowan
then met with Peake and Serra to address this issue on November 22, 2005.  Cowan
participated in these meetings at the request of Saltchuk/TOTE's Magee and Horizon's
Keenan.

146.    In January 2006, Gill set up a meeting to introduce Glova to Baci at the
Lodge Alley Inn in Charleston, South Carolina.  At that meeting, Gill and Baci disclosed
the details of the conspiracy to Glova and explained what Glova's role would be going
forward.

147.    After this meeting, Glova immediately became active in the conspiracy
and began coordinating directly with and frequently with Baci, Trailer Bridge's David
Miskowiec and Crowley's Tom Farmer about key accounts and in furtherance of all
aspects of the conspiracy.

148.    In August 2006, Sea Star's Peake and Baci met with Horizon's Serra and
Glova in Orlando, Florida to discuss the 50-50 split of the Puerto Rico Cabotage market
and determine the specifics of how the agreement would work with respect to refrigerated
containers, or "reefers."

149.    On October 24, 2006, Sea Star's Peake and Baci met with Horizon's Serra and Glova again in Orlando at the Hyatt Orlando Airport Hotel to review market share information, exchange customer information, and reach agreements about specific customers.

150.    Sea Star's Peake and Baci and Horizon's Serra, Gill, and later Glova were in regular communication at all times following the initial April 2002 meetings and met in order to coordinate pricing and volume on customer accounts in a purposeful effort to maintain the 50-50 market division described herein.  Such communication was necessary to account for contract renewals, volume reductions and/or increases, and unanticipated carrier changes by customers.

151.    These individuals also developed what became known as "sacrificial lambs" lists, which identified customers that one company was willing to give up to another in the event that market shares shifted in a manner inconsistent with the industry agreement.  On information and belief, they did, in fact, use these lists to maintain proportional market shares and preserve the operation of the conspiracy.

152.    In December 2006, Sea Star's Peake and Baci met with Horizon's Serra and Glova in Orlando, Florida.  At this meeting, the individuals discussed various aspects of the conspiracy, including Sea Star's 2007 Yield Plan and the capacity sharing agreement between Sea Star and Horizon.

153.    In September 2007, Sea Star's Baci met with Horizon's Gill and/or Glova to again discuss Yield Plans as well as other aspects of the conspiracy.  This meeting occurred at the World Golf Village near Orlando.

154.    On February 20, 2008, Sea Star's Peake and Baci met with Horizon's Serra and Glova in Orlando, Florida to discuss various aspects of the conspiracy.

155.    On March 32, 2008, Horizon's Serra and Crowley's Grune met at a Starbucks coffee shop in Orlando, Florida to discuss various aspects of the conspiracy, including customer allocation and pricing.

156.    On April 12, 2008, Saltchuk's new President, Tim Engle met with Crowley's Grune in Fort Lauderdale, Florida.  Previously, Engle had spent at least a month working in various departments at Sea Star to familiarize himself with Sea Star's business.

157.    Two other Jacksonville based companies, Crowley and Trailer Bridge also participated in this conspiracy soon after it began.

158.    Baci had been a long-time Crowley employee before joining Sea Star. While at Crowley, Baci had met and developed relationships with Chisholm and Tom Farmer ("Farmer"), who worked for Baci, at Crowley, for approximately ten years. Farmer participated in the conspiracy on Crowley's behalf, and worked with Baci to implement the conspiracy, as more fully described below.

159.    Farmer communicated regularly with Baci, Gill, and later Glova and agreed to fix prices for Puerto Rican Cabotage and participated in the allocation of customers among Sea Star and Horizon.   Farmer, Baci, and Gill/Glova agreed to both general rate increases related to classes of freight and fuel surcharges, as well as rates to specific customers when such contracts were due for renewal.  They also communicated for purposes of rigging bids to certain customers including Plaintiffs.

160.    On many occasions, the specific dates being known only to the conspirators, the conspirators met to discuss specifics of the conspiracy.

161.    For example, in 2007, Farmer met with Sea Star's Baci, Ed Pretre, and Chisholm, at a breakfast meeting at the University Diner in Jacksonville. On information and belief, Baci and Farmer discussed and exchanged pricing at this meeting. In furtherance of the conspiracy, Farmer met periodically with Horizon's Glova beginning in 2006 and continuing until April 2008.

162.    Farmer's boss, Rob Grune, met with Serra in furtherance of the conspiracy on numerous occasions, including meetings in April, July and October 2006, January and June 2007, and April 2008 in various locations, primarily in Florida and Puerto Rico. The earlier meetings focused on general concepts of market behavior and the need to work together to keep prices up, while later meetings addressed coordination of specific prices to specific customers. Grune had similar meetings and discussions with Sea Star's Frank Peake, who lived near him.

163.    Crowley's CEO Tom Crowley, Jr. also met or talked with Horizon's Chuck Raymond on several occasions in an effort to coordinate the market, stabilize shares and increase prices particularly when issues arose that their subordinates could not resolve.

164.    Crowley utilized barges rather than "blue water" vessels used by Horizon and Sea Star, and consequently it generally charged lower rates. However, Crowley, Sea Star and Horizon agreed that they would try to maintain a "spread" of approximately $300 between "blue water" rates and barge rates.

165.    Crowley, Sea Star, and Horizon also agreed not to target each other's key customers and to work to maintain market shares.

166.    Horizon, Sea Star, and Crowley had similar conversations and agreements with Trailer Bridge.  For example, Baci had discussions with David Miscoweic, Vice President of Sales for Trailer Bridge, who he previously knew from working together at Crowley.  These discussions included plans for pricing to customers, categories of customers and bunker fuel surcharges and directly resulted in Trailer Bridge raising its prices and surcharges.

167.    Upon information and belief, the coordination with Trailer Bridge broadened over time, and Miscoweic held similar conversations with Crowley's Farmer and Horizon's Gill and Glova.

168.    Upon information and belief, Miskowiec was placed on administrative leave for a period of time with respect to the allegations in this Complaint.

169.    Defendants and their co-conspirators routinely shared contract logs containing customer volumes and contract expiration dates for every major customer in the Puerto Rican cabotage market.  Certain customers split their shipping volumes among Crowley, Sea Star, Trailer Bridge, and Horizon, and those carriers agreed to maintain their respective share volumes.  The information these conspirators shared allowed the conspirators to coordinate their bid-rigging efforts to ensure that the largest volume carrier for each customer set the rates with that customer and that the remaining carriers would not underbid.

170.    Sea Star's Baci would periodically prepare a listing of the top 100 Puerto Rican Cabotage customers, known as the "Hall of Fame" list. Baci shared the "Hall of Fame" list with competitors, and, for certain key accounts, the conspirators would designate the carrier with the greatest volume on the account as the primary carrier(s) so that other carriers would know not to interfere with that business. For example, in October 2006, Baci sent such a list to Horizon, and the list identified Home Depot as a top account that was designated as a Crowley account.

## III.    Effects of the Conspiracy

171.    The conspiracy to fix rates and surcharges, allocate customers, and artificially limit capacity alleged herein allowed Defendants and their co-conspirators to stabilize and increase prices for Puerto Rican Cabotage throughout the conspiracy period.

172.    During the conspiracy period, the Defendants and their co-conspirators were able to obtain and sustain rate increases despite significant decreases in the volume of containers shipped. For example, between 2003 and late 2007, Sea Star improved its net-to-vessel amount by over 45% or nearly $800 per container. Such improvements directly benefited Saltchuk as well. Horizon's revenue from its general rate increases jumped from $16,700,00 in 2004 to over $51,578,000 by 2007. Upon information and belief, Trailer Bridge and Crowley experienced similar revenue increases.

173.    The rate improvements alleged herein were a direct result of the conspiracy. After the conspiracy was exposed to the public by the U.S. Department of Justice investigation, rates charged by Defendants and their co-conspirators began to fall to more competitive levels as the effects of the conspiracy dissipated.

IV.     **Fraudulent Concealment of the Conspiracy**

174.     During the conspiracy period, Defendants and their co-conspirators took measures to purposely and fraudulently conceal their unlawful activities from being discovered by Plaintiffs or the general public. This affirmative conduct was designed to and did prevent Plaintiffs from discovering the facts comprising this conspiracy.

175.     Plaintiffs did not and could not have discovered through the exercise of reasonable diligence even the possible existence of the conspiracy alleged herein until at least April 17, 2008, when Horizon publicly announced that it was served search warrants and a grand jury subpoena relating to an investigation of pricing practices of ocean carriers operating in the Puerto Rico trade.

176.     Because all of the material facts were exclusively in the hands of the Defendants and their co-conspirators, and because the U.S. Department of Justice did not and would not disclose the findings of its criminal investigation, Plaintiffs did not and could not have discovered factual details about the conspiracy until October 1, 2008, when the U.S. Department of Justice announced certain details about the conspiracy in connection with the indictments of Baci, Gill, Glova, and Serra.

177.     As alleged herein, Baci, Gill, Glova, and Serra all pleaded guilty to participating in the conspiracy and, *inter alia*, engaging in efforts to conceal its existence.

178.     To conceal the conspiracy from customers and the authorities, Gill, Glova, and Baci used secret email accounts separate from their customary business email accounts to communicate with each other, *e.g.*, "Lighthouse123" for Baci and "Ann

Clark" for Gill. They also used disposable cell phones to communicate with each other. Further, they falsified expense reports in order to cover up their illegal behavior.

179.    The conspirators also provided false information to customers concerning rates, surcharges, and offers. For example, the conspirators provided false or pretextual information to customers concerning the reasons for increases in rates. Additionally, the conspirators designated key customers belonging to each company as so-called "Hall of Fame" accounts. Conspirators who did not "own" a particular Hall of Fame account would still make sales calls on those accounts in order to keep up the appearance of competition. However, as alleged herein, they frequently made uncompetitive offers for such business, thus ensuring that each company kept its key accounts and that prices did not drop.

180.    The fraudulent concealment alleged herein, which made it impossible for Plaintiffs to uncover the existence of the conspiracy, had the effect of equitably tolling the running of any applicable statute of limitations as to any of Plaintiffs' claims arising from the anticompetitive conduct by the Defendants and their co-conspirators as alleged herein.

181.    Pursuant to 15 U.S.C. §16(i), the investigation of the U.S. Department of Justice, which the Department confirmed was ongoing in a press release from November 2011, also has the effect of tolling the running of the statute of limitations as to any of Plaintiffs' claims arising from the anticompetitive conduct by the Defendants and their co-conspirators as alleged herein.

182.   The filing of the putative class actions related to anticompetitive conduct in the Puerto Rican Cabotage market, which were consolidated into multi-district litigation in the United States District Court for the District of Puerto Rico, had the effect of tolling the statute of limitations as to any of Plaintiffs' claims arising from the anticompetitive conduct by the Defendants and their co-conspirators as alleged herein.

## COUNT 1

183.   Plaintiffs incorporate by reference the allegations in Paragraphs 1 through 182 of this Complaint.

184.   Beginning at least as early as May 2002 and continuing until April 2008, Defendants, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding and conspiracy in restraint of trade to restrict competition by allocating customers, rigging bids, and fixing the prices of rates, surcharges and other fees for Puerto Rican Cabotage in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

185.   Defendants' unlawful conduct resulted in artificially high, supra-competitive prices charged by Defendants and their co-conspirators to Plaintiffs.

186.   Plaintiffs paid more for Puerto Rican Cabotage services than they would have paid in a competitive market unfettered by Defendants' and their co-conspirators' unlawful anticompetitive activity.

187.   Plaintiffs seek to recover three times their overcharge damages that they suffered as a result of this conspiracy, plus interest, attorneys' fees and costs of litigation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a trial by jury and judgment against Defendants as follows:

(a)    following the jury trial, a judgment against the Defendants, jointly and severally, in accordance with the jury's findings regarding the scope, extent, and duration of the conspiracy, for three times the damages awarded by the jury;

(b)    a judgment against the Defendants, jointly and severally, in accordance with the jury's findings regarding the members of the conspiracy, for an award of the Plaintiffs' costs and reasonable attorneys' fees;

(c)    a declaratory judgment that the unlawful combination and conspiracy alleged herein was in fact in unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(d)    an injunction against repeated violations of the antitrust laws of the United States, upon such terms as the Court finds just, but including an order under appropriate state and federal laws either debarring the liable defendants from government contracting or requiring the notification of all state and federal entities with statutes or regulations providing for the potential debarment of contractors for violations of the antitrust laws; and

(e)    for such other and further relief as the nature of the case may require or as may seem just and proper to the Court.

This 29th day of October, 2012.

W. Bard Brockman
Florida Bar No. 0868817
G. Patrick Watson (*pro hac vice* pending)
Georgia Bar No. 741226
**BYRAN CAVE LLP**
One Atlantic Center – 14th Fl.
1201 W. Peachtree St. NW
Atlanta, Georgia 30309
Tel:    (404) 572-6600
Fax:    (404) 572-6999
Bard.Brockman@bryancave.com
Patrick.Watson@bryancave.com

*Trial Counsel for Plaintiffs Home Depot*
*U.S.A., Inc. and Kimberly-Clark*
*Corporation*